**LaVonia R. CLARKE and Charles H. Clarke**

v.

**GENERAL MOTORS CORPORATION.**

Civ. A. No. 73–1126.

United States District Court,
E. D. Pennsylvania.

April 20, 1977.

Thomas F. Schilpp, Media, Pa., for plaintiffs.

George J. Lavin, J., Philadelphia, Pa., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

TROUTMAN, District Judge.

I.

JURISDICTION AND PARTIES

The plaintiffs, LaVonia R. Clarke and Charles H. Clarke, her husband, are citizens

of the Commonwealth of Pennsylvania, residing in the City of Philadelphia. The defendant, General Motors Corporation, is a corporation with its headquarters or principal place of business located in Detroit, Michigan, which is engaged in the business of manufacturing and selling automobiles.

The controversy is alleged to involve in excess of $10,000 and, therefore, jurisdiction is presumably based upon 28 U.S.C. § 1332. While no evidence was introduced as to diversity of citizenship, jurisdiction has not been affirmatively questioned. Therefore, we find and conclude that this Court has jurisdiction.

## II.

### THE PLAINTIFFS' CONTENTIONS

The plaintiffs' complaint (paragraph 9) alleged (1) negligence, (2) breach of express or implied warranties, and (3) design defects. During the course of the trial negligence was expressly abandoned as a basis for recovery and plaintiffs pursued the theories of breach of warranty, express or implied, and strict tort liability within the meaning of Restatement 2d—Torts, § 402A. An express warranty was not proven. Neither was an implied warranty pursued except to the extent that it is, in some respects, not dissimilar to certain of the considerations relevant to Restatement § 402A. Plaintiffs bottom their case upon Restatement § 402A which provides:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Admittedly, the defendant is engaged in the business of manufacturing and selling automobiles, including the vehicle here involved, which utilized the Saginaw power steering system manufactured by a division of the defendant corporation. The vehicle reached the plaintiff without substantial change in condition.

Plaintiffs had the right to expect that the vehicle would meet reasonable safety expectations and here "contend that they need only show under Section 402A, that the product was in fact (1) unreasonably dangerous due to (2) a defective condition and (3) that said defect caused driver's injury". (Plaintiffs' suggested conclusions of law, page 2). They contend that the vehicle involved went into a spin and out of control and that "(i)f linked in an evidentiary manner to a 'defect', the results certainly indicate that it was unreasonably dangerous". (Plaintiffs' suggested conclusions of law, page 2).

## III.

### THE APPLICABLE LAW

The plaintiffs contend, and we recognize, that under § 402A, a "defective condition" can be established *without* specific proof of a design defect. Evidence of a mechanical malfunction *can* be the basis for such finding. *Greco v. Bucciconi Engineering Co.*, 283 F.Supp. 978 (W.D.Pa.1967). It is the law of Pennsylvania, as plaintiffs assert, that a plaintiff in a strict liability case can establish a "defective condition", within the meaning of § 402A, by proving that the product functioned improperly in the absence of abnormal use and reasonable secondary causes explaining the malfunction. *Greco v. Bucciconi Engineering Co.*, 3 Cir., 407 F.2d 87.

*MacDougall v. Ford Motor Company*, 214 Pa.Super. 384, 257 A.2d 676 (1969) upon

which plaintiffs heavily rely, involved a new vehicle, less than 30 days on the road, with a mileage of 143 miles. Prior to the incident in question the vehicle had never been driven over 30 M.P.H. It was, for the first time, being driven at 60 M.P.H. on the Pennsylvania Turnpike, when it "handled badly", the steering seemed "loose" at times and sometimes seemed to "stick". Losing control of the vehicle, it proceeded on to the medial strip of the highway. The steering then failed to respond for a moment and on a second attempt to steer the vehicle it "oversteered". Metal flakes were found in the steering assembly. In addition, two other conditions were found, namely, a "tight" bearing on the steering shaft and a "'high point' on the sector shaft was adjusted too tightly" (p. 386, 257 A.2d p. 678). Because, to some extent, the plaintiffs' expert testimony here parallels that of plaintiffs' expert in *MacDougall,* we quote as follows from the *MacDougall* opinion:

"* * * In Summer's opinion, the metal flakes, if lodged in the gear mechanism, could cause temporary steering tightness, as could the tight bearing on the steering shaft.

"The function of the 'high point' on the sector shaft is to stabilize steering during straight forward driving. Summers indicated that the improper adjustment to the 'high point' would cause the car to oversteer when the wheel was turned and would require the driver to make constant steering corrections to maintain a straight forward course. While not giving an opinion as to whether the metal flakes or tight bearings prompted the accident, Summers suggested that the adjustment to the sector shaft was 'very likely' to cause the accident.

"Appellant argues that appellees have failed to meet their burden of proof of causation as Summers did not state unequivocally that the specific defects in the steering assembly were the cause of the accident.

"Appellant's liability is governed by Restatement of Torts, Second, § 402A, which provides: 'One who sells any product in a defective condition unreasonably

dangerous to the user . . . is subject to liability for physical harm thereby caused to the ultimate user . . . .' Mrs. MacDougall's testimony permits a jury finding that a malfunction of the steering mechanism caused the accident. As the causal connection between the accident and the malfunction is established, appellant's contention fails if a mechanical malfunction evidences a 'defective condition' within the meaning of § 402A.

"Unless able to rely on the doctrine of res ipsa loquitur or exclusive control, a plaintiff asserting liability on grounds of negligence must connect injury with a specific defect in the manufacture or design of a product. *Loch v. Confair,* 372 Pa. 212, 93 A.2d 451 (1953). Consequently, if the evidentiary standards of negligence governed § 402A actions, mere proof of a malfunction would not sustain the verdict for appellees.

"However, in *Greco v. Bucciconi Engineering Co.,* 283 F.Supp. 978 (W.D.Pa. 1967), aff'd, 407 F.2d 87 (3d Cir. 1969), the District Court for the Western District of Pennsylvania, in construing Pennsylvania law, held that § 402A actions are governed by the evidentiary standards of warranty law rather than negligence and that under these standards the occurrence of a mechanical malfunction evidences a 'defective condition' without proof of the specific defect in design or assembly causing the malfunction. We find *Greco* to be a correct statement of Pennsylvania law.

\*     \*     \*     \*     \*     \*

"Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. 'When machinery "malfunctions", it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the "sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.' " (citations omitted.)

■ Thus, in approaching the evidence, we are aware of the fact that the absence of proof of a specific defect is not fatal to plaintiffs' claim and liability may nonetheless exist. *Jarnot v. Ford Motor Company*, 191 Pa.Super. 422, 156 A.2d 568; *Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 242 A.2d 231. It is a matter for the fact-finder, i. e., whether it can reasonably infer from the evidence, including expert testimony helpfully produced by the parties, the occurrence of a malfunction resulting from a defect and causing the incident from which damages ensued. Understandably, the inference must be reasonably drawn from the evidence and the circumstances surrounding the accident.

■ Among other considerations is the period of time that the alleged offending article or vehicle was used and the extent of its use prior to its alleged malfunction. In *Greco v. Bucciconi Engineering Co.*, 407 F.2d 87, 89 (3d Cir. 1969) the period was four days; in *MacDougall* it was less than 30 days—mileage 143; in *Dennis v. Ford Motor Co.*, 332 F.Supp. 901 (W.D.Pa.1971) two days—10 miles, and in *Kridler v. Ford Motor Company*, 422 F.2d 1182 (3d Cir. 1970), the difficulties with the steering commenced "shortly after the purchase" described as " 'hard steering' which caused the car to 'handle like a truck', making both left and right turns very difficult." The vehicle was returned to the dealer for repairs 24 times in five months suggesting an ongoing and continuous problem from the date of purchase. This is not to suggest that extended use or lapse of time is the sole criteria to be used. Convincing proof of an original defect will overcome lapse of time or use. Absent such proof, continued use, over an extended period of time may well prevent the inference to be reasonably drawn by the fact-finder that the article was defective when sold. The test to be applied is "whether reasonable and well balanced minds would be satisfied from the evidence adduced that the defective condition existed when the machine was delivered": *Greco v. Bucciconi Engineering Co., Inc.*, 407 F.2d 87, 90 (3d Cir. 1969); *Dennis*

*v. Ford Motor Company*, 332 F.Supp. 901, 902 (W.D.Pa.1971).

Lapse of time and continued use, under the circumstances of a given case, may preclude the reasonable inference of a defective mechanism (design defect) even though an inference or finding of malfunction is warranted. *Kuisis v. Baldwin-Lima-Hamilton Corporation*, 457 Pa. 321, 319 A.2d 914 (1974). As the court there stated:

"On the evidence here presented, then, the question is whether a jury could reasonably draw the inference that the brake locking mechanism was defective when the crane was delivered to North Star. We think that any such conclusion would be no more than a guess. Section 402A does not make manufacturers and sellers insurers of their products. * * * " (p. 922)

Likewise see *Stein v. General Motors Corporation*, 58 Pa. D & C 2d 193 (1972), affirmed, 222 Pa.Super. 751, 295 A.2d 111 (1972).

## IV.

## THE PLAINTIFFS' EVIDENCE

The plaintiffs' evidence consisted of the testimony of the plaintiff, LaVonia R. Clarke, and that of her expert witness, Albert G. Fonda.

The plaintiff, a lady 57 years of age, who had been a licensed operator of motor vehicles in the Commonwealth of Pennsylvania for a period of four years, testified that on January 23, 1972, she was the owner of a 1970 Chevrolet Nova which she had purchased new at Pensky Chevrolet in October, 1969. It was equipped with a power steering system admittedly designed by the Saginaw Steering Gear Division of the General Motors Corporation. Prior to January 23, 1972, she experienced a problem with the power steering system when, on a sharp turn in either direction, the motor sometimes stalled, cutting off power to the power steering system. The system is intended to offer assistance to the motor vehicle operator when steering in either direction. Other than the stalling of the motor on

approximately four occasions, a condition obviously not constituting a defect in the steering system, she experienced no difficulty with the power steering system prior to January 23, 1972. Following the purchase of the vehicle certain warranty repairs, not related to the power steering system, were made thereto.

On January 23, 1972, the plaintiff, LaVonia R. Clarke, was the driver and sole occupant of said vehicle as it proceeded south on Belmont Avenue in the City of Philadelphia. At about 4 P.M. on that Sunday afternoon at a point north of Winfield Avenue, the plaintiff was operating said vehicle, she states, in the southbound inside lane at a speed of about 30 miles per hour when, under traffic conditions which she described as "moderately heavy" and on a surface which was dry, she attempted to gradually turn into the outside southbound lane of said four-lane highway. She describes the vehicle as first going into an "S" turn, otherwise described as a "weaving" motion. Sensing that the vehicle was out of control, she lightly applied the brakes and the vehicle went into a spin, crossed the two northbound lanes of Belmont Avenue and collided with a tree located on the eastern edge of Belmont Avenue at a point approximately 500 feet north of Winfield Avenue. The steering wheel did not lock, but turned in response to her efforts on at least three occasions before the vehicle went into the spin when she was "unable to steer it". The vehicle never got into the righthand southbound lane, but zig-zagged, as she described it, in the inside southbound lane. The motor on this occasion did not stall and she had suffered no like experience in the past. The road was basically level and straight. The odometer reading at the time was approximately 8000.

On April 15, 1975, plaintiffs' expert, Albert G. Fonda, examined the power steering system when the odometer reading was 23,-375, after the vehicle had been repaired and subsequently purchased by a Mrs. Comber. His examination at that time consisted of the insertion of a magnetic probe into the opening to the oil reservoir on the power steering system. The magnetic probe disclosed what he described as a "slight" magnetic pick-up from the power steering fluid which he described as a "contamination" of the power steering system. He again examined the vehicle on November 23, 1975, at which time he drove it and detected nothing unusual about its operation. He testified that the power system in question is known as a "linkage" system as opposed to an "integral" system, the latter having been used, he stated, on the Chevrolet II and the Corvette, in both of which, he testified, a filter system was provided to eliminate "contamination". He explained that contaminants in a power steering system are either built in at the time of manufacture, introduced thereafter, or generated within the system itself. He further explained that the presence of a contaminant in the system increases the rate of wear of the components of the system, causing "possible" eventual malfunction of the component. A magnetic system, as opposed to a filter system, eliminates contaminants but only those of metallic origin. He stated that the presence of contaminants "could eventually possibly" cause a malfunction in the nature of a binding or blockage of the system and that these possible results "need to be minimized" to assure the operation of the system. He was unable to define any limits as to the amount of contaminants which the system will tolerate and continue to operate properly. As he explained, it is necessary or desirable to filter out those contaminant particles of a size such as would cause damage or otherwise interfere with the operation of the system. The clearances of the various mechanisms within the system determine the size of the particles which the system will tolerate yet continue to properly function. He admitted that the objectionable level of contaminants depends upon testing of the particular system, arrived at by virtue of laboratory testing and field studies, in which he had not engaged either as to this or any other system. He concluded that in the absence of any other explanation for the incident in question, "malfunction" of the power steering system is "indicated". He was unable

to explain how the alleged malfunction occurred because as he stated "the system is sufficiently complex that I cannot identify with reasonable certainty the specific malfunction within the system". In that light he described the contamination which he found in 1972 as "an unfavorable factor, but without knowing the specific defect, I cannot be certain of the correlation". He stated that the presence of contamination and the absence of a filter system to remove it is, in his opinion, a "design defect" which he theorizes was here followed by a "performance defect", stating that "the design defect is capable of causing the performance defect. Whether it did in this particular instance is not known". He was unable to detail and indeed expressed no opinion as to what particular or specific malfunction occurred to the exclusion of other alternatives.

As to causation, he was unable to express an opinion that the so-called design defect, i. e., the lack of a filtration system, caused a malfunction of the system on January 23, 1972. Rather, he stated that "it is among the possible causes of the performance". He stated:

"Q. So you are not prepared to render a firm engineering opinion that it was the cause, that defect was the cause of the accident; is that correct?

A. That is correct.

*   *   *   *   *   *

Q. Referring specifically to the case of LaVonia Clarke against my client, is it my understanding that you do not have an opinion or cannot render a firm en-engineering opinion as to precisely what did occur in that system?

A. Correct.

Q. And I will go a little further. You are not in a position to opine or tell us, you know, what happened to such and such a part, because of this contamination that you have described in the system; isn't that right?

A. Correct.

Q. And you are not able to tell us or furnish us with an opinion as to how this would manifest itself, this phenomena, either the driver or the vehicle, are you?

A. I cannot outline alternatives, but since we are not talking about a specific malfunction there isn't a specific way in which it would behave."

(R. 202)

His testimony in its entirety establishes not an expert opinion that a design defect caused a malfunction in performance which caused the accident, but rather the suggestion that such conclusion is not inconsistent with what he labeled as a design defect.

We conclude that such testimony does not afford the basis for a finding either that there was a design defect in the power steering system in that it lacked a filtration system, or that there was a malfunction of the system by reason of such alleged defective design. That a malfunction of the system from whatever cause, not here proven, is consistent with the Fonda theory is not enough. It is in essence a boot-strapping operation by the witness in which, from his conclusion of a design defect—the lack of a filtration system—he assumes a malfunction of the system from whatever cause and then argues that his conclusion is defensible because not inconsistent with his theory. In essence, following *MacDougall,* he draws the inference which is properly reserved only to the fact-finder under the cases heretofore cited. Even if the presence of contaminants in the system is not inconsistent with the conclusion that a malfunction occurred as a result thereof, more than that is required to establish causal connection and resultant liability. Accordingly, we find, on the basis of plaintiffs' evidence, that (1) there was no design defect in the vehicle in question; (2) there was no malfunction of the power steering system as the result of the design defect alleged; (3) there was no malfunction of the power steering system from any known and proven cause, and (4) there was no causal connection between the power steer-

ing system and the *manner* in which it functioned on January 23, 1972, and the unfortunate accident of that date resulting in injuries to plaintiff and damage to her vehicle.

## V.

### THE 41(b) MOTION

At the conclusion of the plaintiffs' case, the defendant submitted a motion for involuntary dismissal under F.R.C.P. 41(b) which the Court, as allowed by said rule, took under advisement pending the close of all the evidence. That motion will be granted.

The theories of implied warranty and strict liability under § 402A cannot afford the basis for recovery on this record. The presence of a "slight" accumulation of metallic particles in the particular steering system in 1975 proves little or nothing with respect to the condition of the system on January 23, 1972. Plaintiffs' expert, obviously well versed and well informed in the field, was careful not to prescribe any limits of contamination as responsible for any malfunction of the system. For the purpose of this motion, it must be assumed that the existence of contaminants in the system is not inconsistent with the theory that a malfunction occurred and that it was the result of such contaminants. That, however, does not establish that contaminants caused a malfunction or indeed that any malfunction occurred. Neither does it afford the basis upon which the fact-finder can reasonably draw the inference that a malfunction occurred as the result of defective design. Without again reviewing the Fonda testimony, it is sufficient to note that the motion under Rule 41(b) at the conclusion of the plaintiffs' case was sound. But for the fact that the required study of the record would have, at that time, delayed the continued taking of testimony, said motion would have and should have been granted.

## VI.

### ON THE MERITS

Testimony having been completed, we proceed, in the alternative, to a considera-

tion of the merits. Having already reviewed the plaintiffs' evidence, we shall not engage in the same detailed review of the defendant's evidence. Suffice it to say that following the accident the vehicle was taken into custody and remained in the custody of the Philadelphia Police Department until January 25, 1972, when it was removed by the Pike's Towing Service. Police investigation at the scene disclosed tire marks or skid marks in the outside southbound lane of Belmont Avenue some 20 feet in length and curving to the left, towards the inside southbound lane, suggesting, but not proving, that plaintiffs' vehicle was in the outside southbound lane when the spin commenced. Evidence was produced as to the repair of the vehicle which included the replacement of the power steering pulley and the rebuilding of the power steering pump. This was accomplished when the odometer reading was 8389.

The repaired vehicle was thereafter purchased in April 1972 by one Elizabeth Comer who appeared as a witness and testified that she experienced no difficulties whatever with the power steering system. It was while she owned the vehicle, on November 23, 1975, that the plaintiffs' expert, Mr. Fonda, operated the vehicle and detected nothing unusual in its operation. On or about November 11, 1976, the power steering system which was in the vehicle on January 23, 1972, the date of the accident, also in the vehicle on April 15, 1975, when examined by Mr. Fonda, also in the vehicle on November 23, 1975, when reexamined by Mr. Fonda, was removed by a representative of the defendant and examined. At that time, the odometer reading was in excess of 31,000.

The extended testimony of the defendant's staff engineer, Charles Spalding, associated with the Saginaw Steering Gear Division, which manufactured the system, established that the system exhibited only those characteristics of normal use incident to a vehicle which had operated approximately 31,000 miles. The magnetic pick-up detected in such examination was that inci-

dent to normal wear and tear. He stated that magnetic pick-up is present in every Saginaw power system now in highway use, was present in the Saginaw power steering system in use in 1970, and has no harmful effect on the operation of the system. This testimony uncontradictedly establishes that the system is basically a manual steering system assisted by hydraulic pressures generated by a pump or pumps attached to and powered by the motor. Upon failure of the so-called "power assist" which is a function of the hydraulic system, the operator resorts to manual steering which, like any non-assisted manual system, consists of a solid connection from the steering wheel to the wheels on the road, subject at all times to the input of the driver at the steering wheel level. Thus, the circumstances of this accident are not inconsistent with the defendant's contention that said accident was the result of driver input in that the plaintiff operator, for whatever reason, lost control of her vehicle without the power steering system or the failure thereof having contributed thereto. We do not find that the accident was or was not the result of driver input or driver failure to have properly controlled the course of her vehicle. To hazard such a finding, on this record, "would be no more than a [mere] guess". *Kuisis v. Baldwin-Lima-Hamilton Corporation, supra.* We refuse to speculate as to the precise cause of the accident. Mrs. Clarke was a most credible witness. She was, in every sense of the word, a "lady" and obviously a fine person. While her testimony establishes *what* happened on January 23, 1972, it does not establish *why* it happened. It is sufficient that we find, as we do, that the accident in question was not the result of a design defect and was not the result of a malfunction of the power steering system. Thus, plaintiffs have failed to meet their burden of proof on those issues and we find in defendant's favor thereon.

It is significant that whereas the plaintiffs' expert, Mr. Fonda, was unable to specify any levels of contaminants as evidenced by magnetic pick-up in a power steering system which can cause malfunc-

tion of the system, the defendant's expert, Mr. Spalding, has observed and participated in extensive and adequate testing techniques of this very system over the years, has examined carefully and in detail the very system here involved and has determined that the magnetic residue therein did not interfere with the efficient and effective operation of the system on January 23, 1972.

We are compelled to conclude that plaintiffs have not established liability on the part of the defendant. Judgment will accordingly be entered for the defendant and in this bifurcated trial we need not reach the question of damages.

The above shall constitute our findings of fact and conclusions of law in accordance with F.R.C.P. Rule 41(b) and Rule 52(a).